UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| AK STEEL CORPORATION, *et al*. | : | Case No. 1:16cv1032 |
| Plaintiffs, | : | Judge Michael R. Barrett |
| v. | : | |
| PITTSBURGH LOGISTICS SYSTEMS, INC. | : | |
| Defendant. | : | |
| | : | |

**OPINION AND ORDER**

This matter is before the Court on Counter Claimant Pittsburgh Logistics Systems, Inc.'s ("PLS") Motion for a Preliminary Injunction (Doc. 24).  AK Steel Corporation ("AK Steel") filed a response (Doc. 26).  The Court held a hearing on January 12-13, 2017.

**I.     FACTS**

The legal woes between these parties have a brief but complicated procedural history. PLS provides third-party logistics services and freight brokerage services.  In December 2008, AK Steel and PLS entered into the most recent Logistics Services Agreement (hereinafter referred to as the "Agreement") whereby PLS would provide truck transportation management and third-party logistics services to AK Steel.  (Jt. Ex. 1).  PLS has been assisting AK Steel with its logistics needs in some capacity since 1995.  The Agreement outsources much of AK Steel's transportation department to PLS, which involves over 700 truck shipments each day covering a large geographic area.  The Agreement is structured as a "buy/sell" agreement.[1]  As such, under

---

[1] According to the testimony, there are two primary types of agreements in the logistics industry: 1) buy/sell agreements; and 2) managed services agreements.  The latter provides more transparency between the company with hauling needs and the logistics provider.   The former on the other hand, transfers more risk to the logistics company.

1

the Agreement, AK Steel pays PLS a set management fee for PLS to negotiate and purchase transportation services to move AK Steel freight. Although AK Steel has the ultimate veto power over carriers entering their facilities, the Agreement provides AK Steel with little transparency with respect to PLS's logistics process. Accordingly, the carriers PLS engages to haul freight for AK Steel contract with PLS directly – not AK Steel. AK Steel does, however, have the right to accept or reject carriers proposed by PLS. (Jt. Ex. 1, Section 2.1(iv)). The Agreement also includes various confidentiality provisions to protect proprietary information shared between the parties.

On July 22, 2016, AK Steel informed PLS that is was terminating the Agreement pursuant to Section 4.1.[2] (PLS Ex. 3). In the same letter, AK Steel informed PLS that it intended to put the transportation logistics services out for bid and invited PLS to participate in the bid. On October 5, 2016, Ryder Integrated Logistics, Inc. ("Ryder") was awarded the bid. The new transportation logistics contract is scheduled to commence on January 18, 2017, upon expiration of the Agreement. The same day it lost the bid PLS was advised that in three weeks Ryder intended to send out a Carrier Request for Proposal (hereinafter referred to as the "Carrier RFP"), a process used in the logistics industry to find motor carriers.

The short three-week timeline raised red flags for PLS. PLS was particularly worried that in order for a new logistics provider to be able to identify appropriate carriers to haul AK Steel freight so quickly, PLS's alleged propriety information would have to be used. PLS also learned that AK Steel had requested PLS routing guides, which PLS asserts are confidential, from an outside processor. Routing guides provide among other information, a list of carriers to call for specific shipping lanes. Concerned that AK Steel was seeking to obtain confidential PLS

---

[2] Section 4.1 of the Agreement permits either party to terminate the Agreement without cause by providing written notice to the other party.

information, PLS sought preliminary injunctive relief in the Court of Common Pleas of Butler County, Pennsylvania on October 6, 2016. PLS does not contend its information was utilized in the bidding process in which Ryder was ultimately awarded the bid, but rather that the information was necessary for the Carrier RFP process.

The Pennsylvania action was initially filed against AK Steel and Ryder. Ryder removed the lawsuit to the United States District Court for the Western District of Pennsylvania.[3] Pursuant to a forum selection clause in the Agreement, the Court dismissed AK Steel from the lawsuit. On October 13, 2016, before the case was removed to Federal Court, PLS was granted injunctive relief against Ryder.[4]

Consequently, that court enjoined Ryder in relevant part from using any PLS trade secrets. Accordingly, AK Steel filed the instant action seeking a declaratory judgment that certain information it seeks to use in transitioning logistics services to Ryder is neither proprietary nor confidential under the terms of the Agreement. (*See generally* Doc. 3).

This prompted PLS to file a Counterclaim, alleging AK Steel breached Article 9 of the Agreement by using and disclosing PLS's confidential information. PLS also alleges that AK Steel violated the Ohio Uniform Trade Secrets Act by obtaining and disclosing proprietary information of PLS to Ryder.

## II. STANDARD FOR INJUNCTIVE RELIEF

PLS seeks injunctive relief enjoining AK Steel from using the carriers PLS used to haul AK Steel freight in the first six months of 2016 – in total, 929 carriers. The threshold issue

---

[3] After AK Steel filed this action, the parties agreed to transfer the Pennsylvania action to this Court. That case is also assigned to the undersigned, Case No. 1:16-cv-1175.
[4] Although that injunction remains in effect, there is a motion to dissolve the same pending. That motion is not ripe for review.

before the Court is whether the identity of PLS's carriers used to move AK Steel freight constitutes a trade secret.

Under Federal Rule of Civil Procedure 65, injunctive relief is an extraordinary remedy, the purpose of which is to preserve the status quo. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). In determining whether to grant or deny a preliminary injunction, the Court must consider four factors: (1) whether the movant has a likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). The foregoing factors are not prerequisites, but are factors that the Court should balance. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

On a preliminary injunction, "a plaintiff must show more than a mere possibility of success," but need not "'prove his case in full." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 543. "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)).

### III.  ANALYSIS

#### 1. Likelihood of Success on the Merits

To show a likelihood of success, a plaintiff must demonstrate more than a mere possibility of success, but it need not "prove [its] case in full." *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  However, "a finding that there is simply no likelihood of success on the merits is usual fatal" to a request for injunctive relief.  (*Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

To establish a claim for misappropriation of trade secrets, PLS must prove: 1) a trade secret exists; 2) acquisition of a trade secret; and 3) the unauthorized use of a trade secret. *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F.Supp.2d 749, 755 (S.D. Ohio 2013).  Under Ohio law, a "trade secret" "means information, including…. a listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Ohio Rev. Code § 1333.61(D).  Courts additionally consider six factors in analyzing whether information constitutes a trade secret:  (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and

5

duplicate the information. *The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 525-26 (1997).

PLS argues its carrier network, including the names and contact information of their carriers, constitutes a trade secret. PLS CEO and President Gary Burns explained that PLS is a non-asset based company. In other words, PLS does not own trucks; rather, they are an information based company that uses data to compile carrier networks to best serve their customers. As for the carrier network used to serve AK Steel, Joseph Bielawski explained that PLS built programs specifically around AK Steel's needs. In total, PLS compiled a carrier network sufficient to manage seven plants and over 130 warehouses. Although PLS acknowledges that in isolation, the names of carriers are not confidential information, it argues that in the context of its carrier network used to move AK Steel freight, their identities are indeed confidential.

### A. **The Agreement**

To begin, AK Steel argues that the Agreement permits AK Steel access to PLS's carrier network, as it relates to AK Steel. Section 4.9 of the Agreement provides:

> If this Agreement is terminated for any reason, any freight carrier that moves freight for AKS or AK Tube through PLS will not be contractually prohibited from continuing to move freight for AKS or AK Tube.

Thus, pursuant to the terms of the Agreement, AK Steel is permitted to contract with PLS carriers. In other words, the specific relief PLS seeks would be a violation of the Agreement.

PLS argues that while these carriers can continue to move freight for AK Steel, they can do so only if they are not using PLS's information. If that is true, then the question remains as to whether the compilation of data that encompasses PLS's carrier network constitutes a trade secret. The language of the Agreement is also helpful in this regard.

Article 9 of the Agreement governs confidential and proprietary information shared between the parties.  Section 9.2 states:

> "Confidential/Proprietary Information" means any oral, written, graphic or machine-readable information, including, but not limited to, that which relates to information and knowledge pertaining to technology, including but not limited to the efaltbed.com [*sic*] technology, patents, patent applications, research, product plans, products, developments, inventions, processes, designs, drawings, engineering, formulae, markets, software (including source and object code), hardware configuration, computer programs, algorithms, operations, methods, ideas, trade secrets, proprietary information, advertising plans, distribution and sales methods, sales and profit figures, customers, clients, suppliers, business plans, agreements with third parties, services, freight rates, shipping volumes, marketing plans or finances of the disclosing party.  Notwithstanding any failure to so identify it, however, all written materials exchanged between AKS and PLS shall be the Confidential/Proprietary Information of the disclosing party.

Noticeably missing from the list of confidential information is "carrier names" or "carrier networks."  Nevertheless, PLS argues that the term "suppliers" encompasses carriers.  The Court disagrees.  Despite including a comprehensive list of information that is confidential, PLS's carrier network is not listed.  Of particular significance, the term "carrier" is used throughout Article 2 of the Agreement notwithstanding being excluded entirely from Section 9.2.  In short, there is no evidence that the parties intended the identities of carriers to be confidential information belonging to PLS.

PLS makes similar arguments with respect to the confidentiality agreement between PLS and AT Kearney (PLS Ex. 1).  These arguments are likewise unavailing.  That agreement also provides a detailed list of information considered confidential.  It even includes specific information related to carriers, such as carrier agreements, deemed to be confidential.  Once again, however, the identity of carriers is not included.

The Agreement also contemplates AK Steel knowing who the carriers are.  The Agreement provides that "[AK Steel] shall have the right to accept or reject in their discretion

7

any carrier that PLS proposes to utilize to transport the freight of [AK Steel]." (Jt. Ex. 1, Section 2.1(iv)).  In order to do so, it is incumbent that AK Steel knows the identity of the carriers chosen by PLS.  Further, Section 2.3(ii)(e) states that "each carrier approved by [AK Steel] shall be assigned a unique User ID Number and password which will enable them to access the System and input data needed to order the transportation of freight, including, but not limited to, origin, destination, description of commodity, delivery date requirements and special instructions, if any.  Prior to being issued a User ID Number and password, a carrier shall complete and submit to AKS an application and be approved by AKS in its discretion."  By requiring carriers to complete and submit applications for approval, the Agreement requires AK Steel to know the identity of carriers.  Further, the information is readily ascertainable by third parties, as detailed below.

### B. <u>Readily Ascertainable</u>

Testimony was provided that AK Steel was generally not aware of the identities of the carriers PLS utilized to haul AK Steel freight.  Nevertheless, AK Steel argues that the names of the carriers are readily ascertainable.  To begin, AK Steel provided evidence that of the carriers that were awarded bids under the new agreement with Ryder, AK Steel had preexisting business relationships with 60% of them.  (AK Steel Ex. 5).  As such, AK Steel already knew their identities.  And as explained above, the terms of the Agreement provide AK Steel the right to know their identities notwithstanding a preexisting business relationship.  Whether AK Steel chose to exercise its discretion under the Agreement is not relevant to the Court's analysis.

The Agreement also addresses exclusions with respect to certain information.  Section 9.8 of the Agreement states in relevant part:

>Notwithstanding the above, neither party shall have liability to the other with regard to any Confidential/Propriety Information of the other, which the receiving party can prove:
>
>>(i) was in the public domain at the time it was disclosed or has entered the public domain through no fault of the receiving party;
>
>>* * *
>
>>(v) becomes known to the receiving party, without restriction, from a source other than the disclosing party, without breach of this Agreement by the receiving party and otherwise not in violation of the disclosing party's rights;
>
>>(vi) is disclosed generally to third parties by the disclosing party without restrictions similar to those contained in this Agreement;

(Jt. Ex. 1, Section 9.8). The evidence shows that a variety of third parties were provided the alleged confidential information without restriction. Under the Agreement, AK Steel is not prohibited from obtaining information from those third parties.

For example, each time freight is moved a Bill of Lading ("BOL") is created. (AK Steel Ex. 6). A BOL provides primarily the following information: 1) the identity of the carrier contracted to PLS; 2) where the freight originated from; 3) where the freight is being shipped; 4) the lane; 5) what is being shipped; 6) the weight of the shipment; and 7) the number of pieces in the shipment. In addition, BOLs are distributed to the following non-exhaustive list of individuals and entities: 1) carriers; 2) guard personnel at AK Steel facilities; 3) outside processors; 4) end customers receiving the shipment; and 5) suppliers and vendors. BOLs are also shown to inspectors at weigh stations upon request. Further, no confidentiality agreement is signed in connection with a BOL. Thus, the identity of PLS's carriers is regularly provided to a wide array of third parties, including personnel associated with AK Steel as part of the hauling process.

For a small fee, two databases also provide limited information with respect to thousands of carriers – FleetSeek and Carrier 411.[5] Both of these databases are publicly accessible. To narrow a search, carriers in a particular region can be searched, as well as carriers that have a certain fleet size. In addition, it is undisputed that the flatbed carrier network—the network used to haul steel—is much smaller than other carrier networks. AK Steel provided evidence it used these databases in part to compile its carrier list. Accordingly, the identity of carriers is in the public domain, and it is reasonable to assume there would be some overlap between carriers.

Finally, PLS takes issue with the letter distributed by AK Steel at the security gate, asking carriers to contact Ryder. (PLS Ex. 20). This letter, however, was distributed to current AK Steel carriers and non-carriers alike. Although many of the carriers coming and going contracted with PLS, it would be an unreasonable prohibition to forbid AK Steel from having any contact with carriers on their property. There is nothing in the Agreement that prohibits the same. Nor is there language that prohibits third party processors from contacting AK Steel directly. Mr. Ritchie further testified that Ryder also received phone calls from carriers who had not contracted with PLS, but had independently heard about AK Steel's agreement with Ryder.

Considering the foregoing, the Court concludes that the names and contact information of PLS's carriers are readily ascertainable. AK Steel already knew, or was entitled to know, the identities of the carriers. Moreover, the information is readily ascertainable through a variety of third parties, as well as publicly accessible databases.

C. **Secrecy**

Similarly, there is little evidence that there was a reasonable effort to keep carrier identities confidential. PLS argues that its list of carriers is distributed to employees and third parties on a need-to-know basis only. Despite this contention, carriers do not exclusively

---

[5] The parties dispute whether a sufficient carrier network can be compiled using these databases.

contract with PLS. Rather, they are third party, for-hire carriers that market their services to any company with hauling needs. These carriers will respond to any bid that benefits their business. They advertise their services, including advertising on the sides of their trucks. There is likewise no attempt to disguise the names of carriers entering and exiting AK Steel facilities.

Moreover, as explained above, there was no attempt to keep secret the identities of carriers from outside processors. In fact, over 100 outside processors and end users were privy to the identities of at least some of PLS's carriers.

Therefore, for the reasons stated herein, with the exception of routing guides discussed below, PLS has failed to make a preliminary showing that it is likely to succeed on the merits of its claim. The identity of carriers is not designated as confidential under the Agreement. Moreover, the record shows that carrier identities were readily ascertainable and were not maintained in secrecy. Accordingly, considering all of the evidence before it, the Court cannot say that the identity of carriers used by PLS constitute trade secrets within the meaning of the Ohio Uniform Trade Secrets Act.

### D. Routing Guides

Routing guides are also distributed as part of the hauling process. (Ryder Ex. 10). Outside processors receive routing guides so they know whom to call when they are ready for a load to be picked up. Similar to BOLs, there is no pricing information included. Moreover, Mr. Burns conceded there is no agreement between PLS and outside processors prohibiting use and disclosure of routing guides. In fact, the language on the routing guides suggests they are not confidential. Specifically, the routing guides include language that once printed, the document is uncontrolled. (Id.).

Nevertheless, PLS argues that routing guides are confidential because they list the priority, or the order in which outside processors should call carriers for a particular lane. Mr. Burns testified that a routing guide is an output of an algorithm used to determine the best carriers for each particular lane.[6] In essence, then, PLS argues AK Steel is "reverse engineering" PLS's information for its own use. Reverse engineering is prohibited under the Agreement. (Jt. Ex. 1, Section 9.5).

The answer to whether routing guides is confidential is a closer call based upon the priority listing, as well as the evidence presented with respect to reverse engineering. However, Mr. Ritchie was skeptical that PLS's priority was the most cost effective way of doing business. He explained that he would not rely on another company's priority list. Further, according to Mr. Ritchie, Ryder manages logistics differently than PLS. Likewise, carriers priced their business for Ryder differently than for PLS. Moreover, the undersigned would be remiss if it did not acknowledge AK Steel terminated the Agreement with PLS, at least in part to see whether it could move its steel for less. Thus, the Court is not convinced that routing guides would provide a benefit to Ryder as PLS argues.[7]

In light of that analysis and based upon the record, the Court finds that it is unable to determine conclusively whether the routing guides constitute trade secrets. At this stage, however, PLS has made the requisite preliminary showing to satisfy its burden. This conclusion does not preclude AK Steel from obtaining the identities of carriers contracted with PLS using other means available.

---

[6] There is no question that an algorithm created by PLS constitutes a trade secret.
[7] As discussed herein, Ryder also asserts that the routing guides were quarantined and were not used to compile its list of carriers.

Evidence was also presented with respect to how the allegedly confidential information was obtained. Because the Court finds that PLS has failed to make a preliminary showing that its carrier network as it relates to AK Steel is a trade secret, the Court need not delve further into a misappropriation analysis. The Court will, however, briefly address the allegation that AK Steel used PLS's information without authorization.

### E. Unauthorized Use

Even if PLS had made a preliminary showing that its carrier network is a trade secret, PLS nevertheless failed to establish unauthorized use by AK Steel. Neither AK Steel nor Ryder dispute that they asked third party processors for routing guides and contact information. In fact, Mr. Ritchie testified he was not surprised he was receiving some of the incumbent's information. In fact, he said it happens to some degree all the time. The reason? The more information the new logistics company has, the better it can serve clients during a transition period.

Nevertheless, AK Steel and Ryder presented testimony that after they became aware of the Pennsylvania litigation, any information associated with PLS's carrier network, including routing guides, names of carriers, as well as contact information of carriers was quarantined. They then began compiling a carrier list from scratch. According to AK Steel and Ryder, in the end, the list of carriers for the Carrier RFP was compiled without the use of PLS's information. PLS balks at this assertion, arguing that the overlap of carriers is not coincidental and shows PLS's information must have been used.

Larry Sutthoff explained that much of the information PLS contends is confidential is stored in AK Steel's IBM database. (AK Steel Ex. 2). According to Mr. Sutthoff, AK Steel transmits information to PLS about a load. Then, a message is provided to AK Steel as to who will pick up the load and when the load will be picked up. Finally, AK Steel notifies a guard that

a truck is coming. All of this information sits in AK Steel's database and is used for its own business purposes. Thus, while the Court acknowledges that there is conflicting testimony in this regard, PLS has presented no evidence that the final list was compiled using its information.

### 2. **Irreparable Harm**

"To demonstrate irreparable harm, the plaintiff[] must show that . . . [she] will suffer actual or imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayetee Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Because loss of trade secrets cannot be quantified, irreparable harm is generally presumed. *Kendall Holdings, Ltd. v. Eden Cyrogenics LLC*, 630 F.Supp.2d 853, 867 (S.D. Ohio 2008).

First, PLS has already lost the bid to Ryder, but nonetheless argues that the damage to its business and competitive standing would be devastating without injunctive relief. It explains that providing Ryder with PLS's carrier network will give Ryder an unfair advantage, as Ryder is a direct competitor of PLS. The Court finds PLS's argument unconvincing for several reasons.

The alleged harm has already occurred – the Carrier RFP process is complete and contracts have been awarded to the winning carriers. The purpose of injunctive relief is to maintain the status quo. Mr. Burns testified that as a result of AK Steel terminating the Agreement, clients assume one of two things: bad service or PLS's price was too high. However, even if this Court were to grant PLS the requested relief, the fact would still remain: PLS lost the AK Steel bid to Ryder. Thus, the alleged "bad optics" would remain. Mr. Burns also testified PLS has lost key employees. However, there is no evidence that PLS lost those employees because of the alleged misappropriation; rather, the evidence suggests the employees

left as a result of AK Steel terminating the Agreement. Therefore, such evidence is not relevant to the question herein.

Moreover, Mr. Burns testified at length about the relationship between AK Steel and PLS, explaining that AK Steel is far and away PLS's biggest account. In fact, AK Steel accounts for 32% of PLS's gross billing. He testified that PLS would be harmed by losing the business to Ryder. He further contended that without PLS's confidential information, AK Steel would not have been able to terminate the Agreement. Mr. Burns and Mr. Bielawski both testified that it would be nearly impossible to enter into a new agreement and conduct a Carrier RFP three weeks later. However, they do not point to anything in the record to support their opinion.

On the contrary, David Belter explained that implementation of the agreement between AK Steel and Ryder has taken approximately 14 weeks from the time of the verbal award of business until now. Ryder was verbally awarded the business in the fall of 2016. Thus, the timeline, although a little quicker than usual, appears to be longer than the three weeks first suggested.

Finally, PLS's argument loses steam because the Court has already concluded that it failed to make a preliminary showing it is likely to succeed on the merits. For these reasons, the Court finds this factor tips in favor of AK Steel.

### 3. Substantial Harm to Others

With regard to determining the probability that granting a temporary restraining order will substantially harm others, "the focus is on the harm that a defendant will suffer[.]" *Lander v. Mongtomery Cty. Bd. Comm'r*, 159 F. Supp. 2d 1044, 1053 n. 18 (S.D. Ohio 2001).

PLS argues any harm AK Steel or other third parties will suffer is outweighed by PLS's alleged harm. The Court disagrees. If the Court was to enjoin AK Steel from using any carriers

PLS used, AK Steel argues its business would be crippled. The Agreement with PLS is scheduled to end on January 18, 2017. The agreement with Ryder will simultaneously commence on that date. Regardless of the logistics company used by AK Steel, AK Steel will still need carriers to move steel. If it is prohibited from using the carriers already awarded bids, its business will also suffer.

Moreover, carriers that have moved freight for AK Steel over the last 20 years are not prohibited from continuing to haul freight for AK Steel. Section 4.9 of the Agreement confirms as much. Evidence was presented that common carriers move 700-900 loads for AK Steel every day. If those carriers are precluded from continuing to haul steel for AK Steel simply because they contracted with PLS, the effect on their business could likewise be crippling.

As for customers receiving steel, such an injunction would have a similar effect. Testimony was presented that AK Steel produces steel for customers such as GM, Ford and Whirlpool, among others. If a limited number of carriers are permitted to haul the many tons of steel each day, these customers might not receive all of the steel necessary to make their products.

With respect to the routing guides, however, the Court finds that AK Steel will not be substantially harmed because it has other means for obtaining the identity of the carriers, as discussed above.

For these reasons, this factor tips in favor of AK Steel.

**4. <u>Public Interest</u>**

The public interest factor also tips in favor of AK Steel. First, public interest favors enforcing contractual agreements between parties. While the parties interpret the confidentiality provisions of the Agreement differently, there is no dispute that the terms "carriers" or "carrier

network" are not expressly included in Article 9 of the Agreement. In addition, evidence was presented that if the number of carriers permitted to haul AK Steel loads is restricted, it could compromise safety. Moreover, less carriers hauling steel would result in higher costs. Public interest favors a competitive marketplace. Finally, if customers cannot receive the necessary steel, they cannot make their products. This could impact the end customer – namely, individuals seeking to purchase products made from steel. PLS does not persuade the Court otherwise.

## IV.  CONCLUSION

Balancing the above factors, the Court finds that injunctive relief as to the identity of PLS's carriers is not warranted as PLS has not met its burden. PLS, has however, made a preliminary showing that its routing guides constitute trade secrets.

Consistent with the foregoing, PLS's Motion for a Preliminary Injunction (Doc. 24) is **GRANTED IN PART.**

**IT IS SO ORDERED WITHOUT BOND FOR GOOD CAUSE SHOWN**.

 _s/*Michael R. Barrett*_____
 Michael R. Barrett, Judge
 United States District Court